# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

Civil Action No. 1:21-cv-1304

ERIC FLORES,

Plaintiff,

v.

3M COMPANY and
AEARO TECHNOLOGIES LLC,

Defendants.

---

# COMPLAINT

---

Plaintiff brings this action against defendants 3M Company and Aearo Technologies LLC, and in support thereof alleges:

## NATURE OF THE CASE

1.   This is a failure to warn product liability action related to an earplug manufactured and sold by Defendants. Plaintiff used Defendants' dual-ended earplugs, as a result of Defendants' failure to warn, now suffers from tinnitus. Defendants knew the earplugs needed to be inserted in a particular manner in order to have any effectiveness. But the Defendants failed to warn potential purchasers of the danger of failing to do so.

## JURISDICTION AND VENUE

2.   This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 because Plaintiff resides in the state of Colorado and Defendant's principal place of business is in the State of Minnesota.

3.   Venue is proper in the United States District Court for the District of Colorado under 28 US.C. § 1391(b) because at all times relevant to the Complaint: (a) Defendants transacted business, were found or acted through subsidiaries or agents present in this District and a substantial part of the events giving rise to the Plaintiff's claims occurred in this District. Alternatively, venue lies under 28 U.S.C. § 1391(c) because Defendants are subject to the Court's personal jurisdiction.

## PARTIES

4.   Plaintiff Eric Flores is an individual residing Colorado Springs, El Paso County, Colorado.

5.   Defendant 3M is a Delaware corporation with its principal place of business in Minnesota.

6.   Defendant Aearo Technologies LLC is a limited liability company formed in Delaware with its principal place of business in Minnesota.

FACTUAL ALLEGATIONS

**A.  Plaintiff Eric Flores's Use of 3M Combat Arms™ Earplugs Version 2**

7.   Plaintiff Flores was a civilian aircraft technician from approximately 2007 to 2013 and from approximately 2014 to the present. His responsibilities included riding in transport vehicles, using firing ranges, and being around heavy machinery.

8.   Plaintiff Flores wore the 3M dual-ended earplugs during his employment. During such times, Plaintiff Flores was exposed to damaging, loud impulse, high-pitched sounds.

9.   In one instance, Plaintiff Flores was using his 3M dual-ended earplugs while on the firing range in June of 2009. Just before firing his rifle, Plaintiff Flores' right Combat Arms™ earplug fell out and his right ear was fully exposed to loud gun shots.

10. Plaintiff Flores did not receive instructions to fold back the third flange on the opposite side of the use end of the 3M dual-ended earplug or a warning that the earplug would not be effective if he did not do so.

11. Plaintiff Flores suffers from tinnitus.

**B.  Defendants' Manufacture and Testing of the Combat Arms™ Earplugs**

12. Aearo Technologies was the global market leader in hearing and eye protection and was based in Indianapolis, Indiana. Aearo Technologies developed, marketed, and sold the Combat Arms™ earplug until being acquired by 3M in 2008 for $1.2 billion. Afterwards, 3M hired Aearo's employees and maintains it as a separate operating unit.

Post-acquisition, the Combat Arms™ earplugs have been marketed and sold under the 3M brand. Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

13. Aearo developed dual-ended, non-linear (selective attenuation) Combat Arms™ earplugs for the specific purpose of providing a single set of earplugs that provide two options for hearing attenuation depending on how they are worn:



14. The earplugs can be worn in an open or "unblocked" position (yellow end in) to block, or at least significantly reduce, loud impulse sounds, while still allowing the user to hear quieter noises. Alternatively, the earplugs can be worn in a closed or "blocked" position (green end in) to block, or at least significantly reduce, all sounds, i.e., operate as ordinary earplugs.

15. Defendants knew these earplugs, at a minimum, required special instructions for use as early as 2000.

16. At all relevant times, the Combat Arms™ earplugs had a tendency to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals. Because the earplug is symmetrical, this occurs regardless of which end is inserted into the ear.

17. Aearo learned of this problem when it completed testing of the Combat Arms™ earplugs. In fact, in February 2000, after the Combat Arms™ earplugs failed specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect.

18. The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR"). The testing and labeling of earplugs such as the Combat Arms™ earplugs to achieve an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. § 4901 *et seq.* Specifically, 40 C.F.R. § 211.206-1 provides:

> The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974.

19. Further, 40 C.F.R. §211.204-4(e) requires that specific supporting information accompany hearing protection devices sold in the United States:

> The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location…. **Instructions as to the proper insertion or placement of the device.**

(Emphasis added).

### C. Aearo's Test Results for the Combat Arms™ Earplugs Demonstrated the Need for a Warning and Special Fitting Instructions

20. The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology.

21. In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ earplug. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/ unblocked (yellow) end of the Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ earplug inserted.

22. Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired

NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects.

23. Despite stopping the test on the green end of the Combat Arms™ earplugs, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ earplugs only because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

24. After prematurely stopping the NRR test of the green end of the Combat Arms™ earplug, Aearo investigated the disappointing test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. *See*, Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975).

25. Aearo also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

26. Aearo later instructed test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

27. Using these manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too-short stem) to allow them to insert the earplugs deeper into their ears to obtain a proper fit. Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ earplug.

28. Due to the symmetrical nature of the Combat Arms™ earplugs, the problem that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs (when

used without the special instructions described above) did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

29. Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end, i.e., folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

30. Aearo did not re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR).

31. Moreover, the need for the special fitting instructions for the Combat Arms™ earplugs is more important during real-life use than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Wearers, such as Plaintiff on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

32. Because the issue was imperceptible to the wearer, an improper fit would go undetected by those who wore them.

33. Defendants continued to sell the Combat Arms™ earplugs until 2016, at which time Defendants discontinued the earplug. *See* Discontinuation: 3M Combat Arms Earplugs Version 2 (Nov. 17, 2015)).

34. Defendants' failure to warn about the need for special fitting instructions for the Combat Arms™ earplugs caused Plaintiff to suffer tinnitus.

35. At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ earplugs without warning of the need for modified fitting instructions.

### TOLLING OF STATUTES OF LIMITATIONS

36. Plaintiff could not, by the exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

37. Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with use of the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

38. Because of Defendants' failure to warn, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that he had been exposed

to the risks alleged herein, and that those risks were the direct and proximate result of Defendants' acts and omissions.

39. Through Defendants' affirmative misrepresentations and omissions pertaining to the safety and efficacy of the 3M dual-ended earplugs, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and continued to misrepresent the risks associated with using the Combat Arms™ earplugs without adhering to the specific fitting instructions discussed above.

## COUNT I: PRODUCT LIABILITY – FAILURE TO WARN

40. Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

41. Defendants are the manufacturers and sellers of the 3M dual-ended earplugs.

42. The 3M dual-ended earplugs that Defendants manufactured, distributed, and sold lacked adequate warnings, instructions, or labels at the time they left Defendants' control.

43. Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the 3M dual-ended earplug to fit correctly in the wearer's ear and create the seal necessary to block out damaging sounds.

44. Defendants had a duty to sell the 3M dual-ended earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff. Defendants breached that duty.

45. Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the 3M dual-ended earplugs when worn in the ordinary course. Defendants breached that duty.

46. It was foreseeable to Defendants that the 3M dual-ended earplugs would be unreasonably dangerous if distributed without a warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

47. Not only was it foreseeable, it was foreseen by Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

48. Defendants also discovered that when the green end of the Combat Arms™ earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms™ earplug was symmetrical, this same problem occurred when the earplug was reversed.

49. Defendants had a post-sale duty to warn of the above alleged product-related risks because Defendants knew or reasonably should have known that the 3M dual-ended earplug posed a substantial risk of harm to wearers, including Plaintiff, if used without adhering to specific fitting instructions; the wearer who used the 3M dual-ended earplug

can reasonably be assumed to be unaware of the risk of harm of using the Combat Arms™ earplugs without specific fitting instructions because the above alleged loosening effect was imperceptible; a warning or instruction showing how to correctly and safely use the 3M dual-ended earplug could have been effectively communicated to and acted upon by the wearer to whom a warning or instruction might be provided; and the risk of harm, including but not limited to hearing loss in wearers, is sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

50. The Combat Arms™ earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the 3M dual-ended earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing unbeknownst to Plaintiff.

51. The warnings and instructions that accompanied the 3M dual-ended earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ earplugs in a manner reasonably foreseeable to Defendants.

52. Had Plaintiff received a proper or adequate warning as to the risks associated with the use of the 3M dual-ended earplugs in the manner contemplated by Defendants, he would not have used them.

53. Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by Defendants during the testing, which were not disclosed

to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

54. Plaintiff suffered injury and damage as a direct and proximate result of Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the 3M dual-ended earplugs that the Defendants manufactured, distributed, and sold.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs and attorneys' fees as follows:

A. Award of monetary damages, including compensatory relief, to which Plaintiff is entitled at the time of trial in an amount exceeding $50,000.

B. Award of pre- and post-judgment interest.

C. Award of costs.

D. Award of all such other and further relief as may be available at law or equity and may be proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 12, 2021

Respectfully Submitted,

_/s/ Richard M. Paul III_

SCHWEBEL GOETZ & SIEBEN, P.A.

**PAUL LLP**

William R. Sieben

Richard M. Paul III

Alicia N. Sieben

601 Walnut Street, Suite 300

Matthew J. Barber

Kansas City, Missouri 64106

5120 IDS Center

Phone: 816-984-8100

80 South Eighth Street

Rick@PaulLLP.com

Minneapolis, Minnesota 55402-2246

Ashlea@PaulLLP.com

Phone: 612-377-7777

bsieben@schwebel.com

**FRANKLIN D. AZAR & ASSOCIATES, P.C.**

asieben@schwebel.com

Franklin D. Azar

mbarber@schwebel.com

Sean McCrary

14426 East Evans Avenue

Aurora, Colorado 80014

Phone: (303) 757-3300

mccrarys@fdazar.com

**ATTORNEYS FOR PLAINTIFF**